PUBLISHED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| Plaintiff, | ) | Case No. 2:05CR00034 |
| v. | ) | **OPINION** |
| **JUSTIN L. JONES**, | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States of America; Henry S. Keuling-Stout, Keuling-Stout, P.C., Big Stone Gap, Virginia, for Defendant.*

This is an appeal from the judgment of a magistrate judge finding the defendant guilty of operating a motor vehicle in a national park while under the influence of alcohol. While I find that the law enforcement officer did not have the authority to arrest the defendant outside of the national park, I conclude that suppression of the evidence obtained pursuant to that arrest is not warranted and thus affirm the conviction.

I

On April 29, 2005, Justin L. Jones was charged with operating a motor vehicle while under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a) (2005), and speeding 60 miles per hour in a 45-mile-an-hour zone, in violation of 36 C.F.R. § 4.21 (2005), all within the confines of the Cumberland Gap National Historical Park (the "Park"). On October 19, 2005, he pleaded not guilty and received a bench trial before a United States magistrate judge. The magistrate judge acquitted the defendant of the speeding charge but convicted him of driving while intoxicated. The defendant noted a timely appeal, *see* Fed. R. Crim. P. 59(g)(2), which has been argued and is ripe for decision.

II

The evidence presented at trial relevant to this appeal is as follows.

While on duty as a law enforcement officer, U.S. Park Ranger Brien Chartier was parked at a Shell station beside U.S. Route 58 in the Park on the night of April 29, 2005, when he observed a vehicle on the highway, later determined to be driven by the defendant, "accelerating at a rapid rate" of speed and "weaving in and out of traffic." (Tr. 5, 23.) Chartier then pulled onto the highway and followed behind the vehicle. Chartier caught up with the vehicle at the base of the entrance ramp onto

U.S. Route 25E southbound, which is located within the boundaries of the Park. Chartier then began pacing the vehicle, and, according to Chartier's testimony, he clocked the vehicle going 65 miles per hour in a 45-mile-per-hour zone.

Chartier activated his blue lights in order to make a traffic stop either just under or just past the walkway located above U.S. Route 25E, approximately one-half mile from the base of the entrance ramp. This area is in Tennessee just outside the confines of the Park. In response to the blue lights, Jones immediately pulled over at the entrance to Lincoln Memorial University in Harrogate, Tennessee.

During the stop, Chartier asked Jones whether he had been drinking alcohol, and Jones replied that he had consumed one beer. Jones later testified that he had consumed one beer just prior to the stop, and that several hours before the traffic stop he had consumed approximately four beers with friends at a family-owned restaurant. Chartier instructed Jones to step out of the vehicle to perform three sobriety tests, namely the horizontal gaze and nystagmus test, the finger count test, and the walk-and-turn test. Chartier testified that Jones failed the lack of smooth pursuit portion of the horizontal gaze and nystagmus test and fell off the line one time during the walk-and-turn test, but Jones testified, and Chartier could not deny, that Chartier had told him he passed all three sobriety tests.

- 3 -

Chartier also administered a preliminary breath test ("PBT") during the traffic stop, which showed Jones' breath alcohol content level to be 0.11. Just prior to midnight, Chartier arrested Jones for operating a motor vehicle while under the influence of alcohol and transported him to the Middlesboro Police Department ("MPD") in Middlesboro, Kentucky. At 12:36 a.m. on April 30, 2005, an officer with the MPD administered a breath test on Jones. The Intoxilyzer 5000 results showed that Jones' breath alcohol content level was .083 grams per 210 liters of breath, an amount in excess of the legal limit of .08 grams per 210 liters of breath.

The defendant moved for judgment of acquittal, arguing in part that Officer Chartier did not have proper authority to make an arrest pursuant to 16 U.S.C.A. § 1a-6(b)(1) (West 2000) and thus the evidence obtained by the Intoxilyzer 5000 should be suppressed. The magistrate judge took the defendant's motion under advisement and allowed time for the parties to brief the issues. The magistrate judge ultimately granted the defendant's motion in part, dismissing the speeding charge, and denied the motion in part, finding Jones guilty of operating a motor vehicle while under the influence of alcohol. *United States v. Jones*, 403 F. Supp. 2d 518, 519 (W.D. Va. 2005) (Sargent, J.).

Having considered the parties' arguments and having reviewed the record below, I find that the officer was without authority to arrest Jones but that suppression

of the evidence produced pursuant to that arrest is not an appropriate remedy. Accordingly, I affirm the defendant's conviction for driving under the influence.

III

This appeal is considered as a court of appeals would were the matter on appeal from a district court bench trial; that is, the magistrate judge's conclusions of law are reviewed de novo, but her findings of fact are reviewed only for clear error. *See* Fed. R. Crim. P. 58(g)(2)(D); *United States v. Orme*, 851 F. Supp. 708, 709 (D. Md. 1994), *aff'd*, No. 94-5419, 1995 WL 131351 (4th Cir. Mar. 27, 1995) (unpublished). The defendant does not contest any of the magistrate judge's factual findings in this appeal, but only her legal conclusions.

The defendant argues that Chartier, as a park ranger, lacked the authority to arrest him because the arrest occurred outside of the Park. Accordingly, the defendant contends that the arrest was illegal and thus the evidence obtained as a result of the arrest must be suppressed. For the following reasons, I find that Chartier lacked the authority to arrest Jones but that the Intoxilyzer 5000 results are nonetheless admissible against him.

A

The authority of a law enforcement officer in a national park is set forth in 16 U.S.C.A. § 1a-6(b), which provides in pertinent part as follows:

> In addition to any other authority conferred by law, the Secretary of the Interior is authorized to designate, pursuant to standards prescribed in regulations by the Secretary, certain officers or employees of the Department of the Interior who shall maintain law and order and protect persons and property within areas of the National Park System. In the performance of such duties, the officers or employees, so designated, may–
>
> (1) carry firearms and make arrests without warrant for any offense against the United States committed in his presence, or for any felony cognizable under the laws of the United States if he has reasonable grounds to believe that the person to be arrested has committed or is committing such felony, *provided such arrests occur within that system or the person to be arrested is fleeing therefrom to avoid arrest* . . . .

16 U.S.C.A. § 1a-6(b) (emphasis added).

It is clear from this statute that park rangers are permitted to make arrests without a warrant for any offense against the United States committed in his presence only if such arrest occurs within the park system or if the person to be arrested is fleeing from that park system to avoid arrest. While Chartier did observe Jones driving at a rapid rate of speed and weaving in traffic within the Park, it is undisputed that the arrest occurred beyond the Park. Therefore, for the arrest in this case to be

- 6 -

lawful, Jones must have been fleeing from the Park in order to avoid arrest within the meaning of § 1a-6(b)(1).

The government contends, and the magistrate judge agreed, that the statutory language "fleeing therefrom to avoid arrest" does not require a showing that Jones had knowledge of the pursuit prior to exiting the Park and an intention to hinder the arrest from occurring, but rather merely requires a showing that Jones departed or withdrew from the Park thereby preventing, whether intentionally or not, the occurrence of his arrest on Park property. *See* 403 F. Supp. 2d at 524. The defendant contends that jurisdiction to arrest outside the Park does not lie absent an intent on the part of the defendant to impede the arrest. I agree with the defendant and find that § 1a-6(b)(1) requires that a defendant have knowledge that he is being pursued by police and a resultant intention to evade arrest.

The magistrate judge's interpretation of § 1a-6(b)(1) is a legal determination and thus I review it de novo. *See Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d 719, 724 (4th Cir. 2005). "Statutory interpretation necessarily begins with an analysis of the language of the statute," and the first thing that must be determined is whether the language at issue has a plain and unambiguous meaning. *Id*. at 724-25. Indeed, it is a fundamental canon of statutory construction that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

- 7 -

Case 2:05-cr-00034-JPJ   Document 6   Filed 04/21/06   Page 7 of 15   Pageid#: 14

meaning." *United States v. Maxwell*, 285 F.3d 336, 340 (4th Cir. 2002) (internal quotation marks omitted) (quoting *United States v. Lehman*, 225 F.3d 426, 428 (4th Cir. 2000)).

As the magistrate judge pointed out in her opinion, one common meaning of to "flee" is "to pass away swiftly." 403 F. Supp. 2d at 524. However, to "flee" is also defined as "to run away often from danger or evil" or "to hurry toward a place of security." Merriam Webster's Collegiate Dictionary 445 (10th ed. 1993). These latter definitions support the conclusion in this statutory context that a person who is fleeing has knowledge of what it is he is fleeing from and intends to escape. Moreover, the common and ordinary meaning of to "avoid" is "to prevent the occurrence or effectiveness of." *Id*. at 80. I find that the plain language of the statute requires a showing that an arrestee knows or reasonably should know that he is being pursued upon exiting the park system.[1]

---

[1] In most cases, proof of awareness of pursuit in a motor vehicle case would not be difficult. For example, if the suspect vehicle did not stop promptly following an officer's request, or if the vehicle continued exceeding the speed limit when the officer came into view, it could be reasonably inferred that the arrestee was fleeing the park system to avoid arrest. Here, of course, the arrest occurred at night, and the officer did not attempt to stop Jones until he was outside the Park.

Chartier testified at trial that when he first saw the defendant's car, it "passed by in such a manner that my suspicion was raised that the vehicle might have been trying to out distance me before I could pull into the road behind it." (Tr. 42.) However, the magistrate judge did not find that Jones knew that he was about to be pursued, and indeed, she determined that § 1a-6(b)(1) "does not require that a defendant have any knowledge that he

- 8 -

Such a showing was not made in the instant case. The evidence is undisputed that Chartier and his partner did not activate their blue lights, thereby initiating the stop, until after they had traveled outside of the Park. The evidence is also clear that Jones pulled over immediately following the initiation of the stop. There is no other evidence from which it could reasonably be inferred that Jones knew that the officers were following him before the initiation of the stop. Therefore, I find that Jones did not flee from the Park in order to avoid arrest within the meaning of § 1a-6(b)(1), and accordingly that Chartier did not possess the authority to arrest Jones outside of the Park.

This conclusion is consistent with the holding in *United States v. Fox*, 147 F. Supp. 2d 1008 (N.D. Cal. 2001). In *Fox*, the defendant's vehicle, while traveling in the Presidio, approached a United States park police officer who was using a radar gun. *Id*. at 1009. The officer clocked the defendant as traveling well in excess of the posted speed limit. *Id*. The officer then signaled the defendant to pull over by activating her flashing lights and began following the defendant. *Id*. Rather than pulling over, the defendant drove on for approximately 200 yards, left the Presidio, and came to a stop about one block outside the park. *Id*. After approaching the car

---

or she is being pursued by police." 403 F. Supp. 2d at 524. Officer Chartier did not further explain how Jones might have seen him at night, or otherwise the basis for his suspicion.

the officer observed signs of intoxication, had the defendant perform certain field sobriety tests, and eventually arrested the defendant for driving under the influence of alcohol. *Id*.

In concluding that the defendant was fleeing to avoid arrest within the meaning of § 1a-6(b)(1) and that the officer was thus authorized to arrest the defendant, the *Fox* court explained that, while it did "not read that section as requiring that the defendant lead the police on a high speed chase to race them to the park's border," the statute was satisfied because the officer attempted to stop the defendant in the park but the defendant continued to travel through the park so that she could not be arrested within its borders. *Id*. at 1010. The court went on to emphasize that its conclusion was bolstered by the fact that "the defendant later contend[ed] that the Park Police lacked jurisdiction to arrest her solely because she managed to leave the Presidio before she stopped." *Id*. The present case is distinguishable from *Fox* in that (1) Chartier did not initiate the traffic stop until both Jones and the officers had crossed outside of the Park and (2) Jones immediately pulled over after the blue lights were activated.

Of course, Congress was not required to limit the authority of law enforcement officers as it did in § 1a-6(b)(1). Under the Uniform Fresh Pursuit Act, as it has been enacted in some states, a police officer may have the extraterritorial authority to arrest

- 10 -

Case 2:05-cr-00034-JPJ   Document 6   Filed 04/21/06   Page 10 of 15   Pageid#: 17

for drunk driving whenever in fresh or hot pursuit and proof of awareness by the suspect of such pursuit may not be required. *See State v. Kowal*, 626 A.2d 822, 825 (Conn. App. Ct. 1993) (holding that under state statute, attempted avoidance of arrest is not required in order to show officer's immediate pursuit). *But see City of Ash Grove v. Christian*, 949 S.W.2d 259, 263-64 (Mo. Ct. App. 1997) (noting that facts indicating lack of knowledge of pursuit were relevant to whether officer was in fresh pursuit).[2] Nevertheless, I must construe the statute as it is written.

B

While I find that Chartier lacked statutory authority to arrest Jones for driving under the influence, I will affirm Jones' conviction because I do not believe that suppression of the Intoxilyzer 5000 results is warranted.[3] "There must be an exceptional reason, typically the protection of a constitutional right, to invoke the exclusionary rule." *United States v. Harrington*, 681 F.2d 612, 615 (9th Cir. 1982).

---

[2] There is a common law doctrine of extraterritorial fresh pursuit, but it is limited to felony arrests. *See City of Ash Grove*, 949 S.W.2d at 263. Some cases have upheld an extraterritorial arrest by a police officer when not in fresh pursuit under circumstances where a private citizen could have validly made the arrest. *See* Russell G. Donaldson, Annotation, *Validity, in State Criminal Trial, of Arrest Without Warrant by Identified Peace Officer Outside of Jurisdiction, When Not in Fresh Pursuit*, 34 A.L.R. 4th 328, 334-61 (1984). However, no such contention is made in this case.

[3] I may affirm the judgment below even though I do so based on a different reason from that relied on by the magistrate judge. *See United States v. Good*, 326 F.3d 589, 591 (4th Cir. 2003).

- 11 -

The majority of courts that have considered the issue have concluded that an arresting officer's lack of statutory authority to make an arrest is not a per se violation of the Fourth Amendment. *See, e.g., Pasiewicz v. Lake County Forest Pres. Dist.*, 270 F.3d 520, 526-27 (7th Cir. 2001) (holding that a forest-preserve officer's arrest of defendant in violation of state statute setting forth his territorial authority did not rise to level of constitutional violation); *United States v. Jones*, 185 F.3d 459, 463 (5th Cir. 1999) (noting that the relevant question when considering suppression of evidence is whether officials violated the Fourth Amendment and concluding that state law deficiencies in arrest were irrelevant); *Abbott v. City of Crocker*, 30 F.3d 994, 997-98 (8th Cir. 1994) (finding that an arrest that exceeded the officer's territorial authority was not an automatic violation of the Fourth Amendment but that the lack of statutory authority could be a factor in determining Fourth Amendment "reasonableness") .[4]

---

[4] For cases holding to the contrary, *see, e.g., Ross v. Neff*, 905 F.2d 1349, 1354 (10th Cir. 1990) (holding that "[a] warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause" and "[a]bsent exigent circumstances, such an arrest is presumptively unreasonable"); *United States v. Foster*, 566 F. Supp. 1403, 1411-12 (D.D.C. 1983) ("The concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer. When a law enforcement official acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause.").

Although the cases cited above all involved violations of state statutes, I see no reason to distinguish this case merely because the statute at issue here is a federal one. The underlying command of the Fourth Amendment is reasonableness, and the fact that an arrest may have violated a territorial-limitation statute, whether it be state or federal, is merely a factor to be considered when deciding whether this constitutional mandate has been followed. *Cf. United States v. Mikulski*, 317 F.3d 1228, 1232 (10th Cir. 2003) (explaining that "'the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended'" (quoting *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999)). While there is no Fourth Circuit precedent directly on point, the opinion in *United States v. Mason*, 52 F.3d 1286 (4th Cir. 1995), lends further support to this proposition. In *Mason*, the Fourth Circuit explained that "[t]he fact that a Customs Agent who was not technically authorized to conduct the search did so does not [standing alone] rise to the level of a constitutional violation warranting suppression of the evidence." *Id*. at 1289 n.5.

Because I find that the fact that Chartier exceeded his statutory authority in arresting Jones, by itself, does not establish a Fourth Amendment violation warranting suppression, I must assess the overall reasonableness of the arrest to determine whether the Intoxilyzer 5000 results must be suppressed under the Fourth

Amendment exclusionary rule. It is well established that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Here, Chartier undoubtedly had probable cause to arrest Jones for driving under the influence because during the initial stop Jones admitted he had been drinking, failed the lack of smooth pursuit portion of the horizontal gaze and nystagmus test, fell off the line during the walk-and-turn test, and blew a 0.11 on the PBT. Furthermore, there is no indication that Chartier knew that he lacked jurisdiction to arrest Chartier just beyond the Park boundary. *See Pasiewicz*, 270 F.3d at 527 (suggesting that such knowledge may indicate unreasonableness under the Fourth Amendment). Therefore, I find that the arrest in the instant case was clearly reasonable, the extraordinary remedy of exclusion of the Intoxilyzer 5000 results is inappropriate, and the defendant's conviction must stand.[5]

---

[5] As alternative grounds for reversal, the defendant argues that Chartier lacked an articulable reasonable suspicion to make the stop and also that he lacked the authority to stop the defendant outside of the Park. These arguments are without merit. The Fourth Amendment permits limited investigative stops by law enforcement officers as long as such stops are justified "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980). Such reasonable suspicion was clearly present when Chartier initially stopped the defendant because Chartier had paced Jones' vehicle at 60 miles per hour in a 45-miles-an-hour zone. While the magistrate judge found that this evidence was unreliable and thus does not prove that the defendant was speeding beyond a reasonable doubt, it is sufficient to show the lower standard of reasonable suspicion necessary to justify an investigative stop. The ongoing detention to investigate whether Jones was driving under the influence was justified both

## IV

For the foregoing reasons, I will affirm the judgment of the magistrate judge. A separate final judgement will be entered forthwith.

DATED: April 21, 2006

/s/ JAMES P. JONES
Chief United States District Judge

---

because Chartier had observed Jones' vehicle weaving in traffic at a rapid rate and also because Chartier smelled alcohol when he approached Jones' car. Therefore, Chartier clearly had reasonable suspicion to perform the investigative stop.

Contrary to defendant's contention, Chartier also had the statutory authority to perform the stop outside the Park under § 1-6(b)(3), which authorizes park rangers to:

> conduct investigations of offenses against the United States committed in [the Park] system in the absence of investigation thereof by any other Federal law enforcement agency having investigative jurisdiction over the offense committed or with the concurrence of such other agency.

16 U.S.C.A. § 1a-6(b)(3). The geographic scope of an officer's investigative authority is not limited to federal property as long as the potential offense being investigated was committed within the park system. *See United States v. Smith*, 713 F.2d 491, 494 (9th Cir. 1983). Here, Chartier observed Jones driving at a rapid rate and weaving in traffic while in the Park and thus was authorized by statute to perform the investigation.